IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| MEGAN RUNNION, a minor<br>Through her mother and next friend,<br>EDIE RUNNION,<br><br>    Plaintiff,<br><br>v.<br><br>GIRL SCOUTS OF GREATER CHICAGO<br>AND NORTHWEST INDIANA<br><br>    Defendant. | Case No.: 12-CV-06066<br><br>Hon. Harry D. Leinenweber |

### MEMORANDUM IN SUPPORT OF PLAINTIFF MEGAN RUNNION'S MOTION FOR A PRELIMINARY INJUNCTION

#### I. INTRODUCTION

Plaintiff Megan Runnion is a twelve-year-old girl who was a Girl Scout from the time she was in kindergarten until this past year, when Defendant, Girl Scouts of Greater Chicago and Northwest Indiana ("Girl Scouts"), stopped providing her with a sign language interpreter. Megan, who is deaf, communicates using American Sign Language ("ASL") and thus requires an interpreter to fully participate with her peers in scouting activities.

Despite requests by Megan's mother, Edie Runnion, to reinstate interpreter services, Defendant refused. Then, in January of 2012, the troop leaders announced that Megan's troop was disbanding. Edie Runnion was informed that the troop was disbanded because of her insistence that Defendant provide interpreter services. Megan has not been offered placement in a new troop with interpreter services. Thus, for the very first time since kindergarten, Megan is not a Girl Scout. Megan is heartbroken at the loss of this important part of her life.

Defendant's discriminatory actions stem from two written policies that violate Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504") as a matter of law – the

financial assistance policy and the pilot policy. These policies are discriminatory because they require Megan, a qualified individual with a disability, to hire and pay for her own interpreter services.

Megan seeks a preliminary injunction invalidating these policies and granting her a qualified interpreter for all troop activities until such time as the case can be decided on the merits. Megan's request meets all the standards for issuance of a preliminary injunction because there is a likelihood of success on the merits of the claim, Megan is irreparably harmed by Defendant's policies, the harm to Megan significantly outweighs any harm to Defendant, and granting the preliminary injunction serves the public interest. Megan seeks a preliminary injunction to enjoin Defendant from applying these discriminatory policies, and to return to the status quo ante when the Girl Scouts were providing her with needed interpreter services.

## II. STATEMENT OF FACTS

Plaintiff Megan Runnion is a twelve-year-old girl who is deaf. Megan cannot hear spoken language. Compl. ¶ 15. She requires the assistance of a sign language interpreter to receive information in group settings. The interpreter conveys through sign language the words spoken by the other members of the group. *Id.* at ¶ 16. The "Language/Mode of Communication Used by Student" specified in Megan's Individualized Education Program, developed by her school district, is "ASL." Megan receives 900 minutes per week of sign language interpreter services and 120 minutes per week of speech therapy services. *Id.* at ¶ 18.

In the fall of 2005, when she began kindergarten, Megan joined Troop #40795. *Id.* at ¶ 22. Megan attended the Troop's monthly meetings, as well as outings such as rock climbing and camping trips. *Id.* at ¶ 26. Defendant provided sign language interpreter services for troop meetings and outings for almost six years, from the date Megan joined Girl Scouts until the

summer before she started sixth grade in 2011. Compl. ¶ 29. By providing a sign language interpreter, Defendant enabled Megan to understand what was said at Girl Scout meetings and activities, gave her equal access to the crucial social and leadership development offered to her peers, and allowed full communication among Megan, her peers, and troop leaders. *Id.* at ¶ 30. On August 29, 2011, as she had done in previous years, Megan's mother submitted a request for sign language interpreter services prior to the start of the scouting year. *Id.* at ¶ 31. On the same day, Defendant denied the request by e-mail, stating that "Currently the Council does not pay for these services." *Id.* at ¶ 32. On October 27, 2011, Megan's mother submitted a reasonable accommodation request for interpreter services for a rock climbing event to take place on November 20, 2011. *Id.* at ¶ 33.

On November 10, 2011, Equip for Equality and the National Association of the Deaf, whose assistance Megan's parents had sought after the August denial of interpreter services, sent a letter to Defendant, requesting a qualified sign language interpreter for all of Megan's Girl Scout meetings and outings, including the scheduled November 20, 2011 rock climbing event. Compl. ¶ 34. On November 17, 2011, Defendant responded to the November 10, 2011 letter by denying that it was subject to Section 504 of the Rehabilitation Act. As to future meetings and events, Defendant stated that it was in the process of developing a uniform policy. *Id.* at ¶ 35. Defendant provided an interpreter for the November 20, 2011 rock climbing event and the December 13, 2011 troop meeting. *Id.* at ¶ 36. At the same time, Girl Scouts stated that it was still in the process of formulating a response to Edie Runnion's request for an interpreter for all scouting meetings and events. *Id.* at ¶ 37.

On January 8, 2012, the leaders of Troop #40795 announced at a dinner event that Troop #40795 would be disbanded. *Id.* at ¶ 38. This announcement was a complete surprise to Megan

3

and her mother, neither of whom knew that the troop was going to be disbanded. Compl. ¶ 39. Edie Runnion was advised by the troop leaders that the reason for the disbandment was the Girl Scouts' decision to no longer fund interpreters. *Id.* at ¶ 40. The troop leaders told Edie Runnion it was her fault that the troop was disbanding, accused her of being selfish by thinking only about Megan and not the other girls in the troop, and said that they had been told by the CEO of Girl Scouts that Edie's Runnion's actions in asking for an interpreter for Megan would cause registration fees for next year to triple. *Id.* at ¶ 41. The troop leaders also told Edie Runnion that by asking for an interpreter for Megan to be able to understand what was being said at the meetings, she was making her daughter more dependent and disabled. *Id.* at ¶ 42.

Megan very much wants to join and participate in another troop, but since Defendant has not agreed to provide interpreter services in any troop in its jurisdiction, she is unable to do so. If Defendant provided interpreter services, Megan would happily join a new troop. *Id.* at ¶ 43;

Defendant has a financial assistance policy that states: "In order to support the participation of girls and adults with special needs, the Council will provide resource lists for girls and adults requiring skilled assistants to participate in Council programs and activities. The contracting of these assistants (e.g., interpreters, occupational therapists, nurse's aides) is the responsibility of the girl's parent(s) or guardian(s) or the adult requiring assistance." *Id.* at ¶ 44 (emphasis added); Pl.'s Ex. A, Def.'s Policies.

Defendant has recently adopted a pilot policy, which states that "Through September 30, 2012 only, support services for those with special needs (e.g., interpreters, occupational therapists, nurse's aides) up to an individual maximum of $50/month per requester. The requestor is responsible for paying the balance of services in excess of $50. Regardless of the number and nature of the requests, there is a council-wide maximum of $5,000." *Id.* at ¶ 45

(emphasis added); Pl.'s Ex. A, Def.'s Policies. The dollar amount of $50 will not pay for the use of an interpreter on even one occasion. *Id.* at ¶ 46.

### III. ARGUMENT

#### A. <u>Standards for a Preliminary Injunction</u>

In *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.*, the Seventh Circuit held that the standard for preliminary injunction requires the court to "engage in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase." 549 F.3d 1079, 1086 (7th Cir. 2008). As a threshold matter, a party seeking emergency relief must demonstrate (1) "that absent a preliminary injunction, it will suffer irreparable harm" if preliminary relief is denied, (2) "that traditional legal remedies would be inadequate," and (3) "that its claim has some likelihood of succeeding on the merits." *Id.*; see *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001); *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). In the context of a preliminary injunction, "a 'likelihood of success' exists if the party seeking injunctive relief shows a 'better than negligible' chance of succeeding on the merits." *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 846 (7th Cir. 1999).

If the court finds that the moving party has passed this initial threshold, it then proceeds to the balancing phase of the analysis. *Abbott Labs.*, 971 F.2d at 12. In weighing these four factors, a "sliding scale" may be used, such that "the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." *Id.* Further, "if the movant demonstrates a significant likelihood of prevailing at trial, he may show a more modest degree of irreparable harm. Conversely, the movant's required likelihood of success decreases as the balance of harms weighs more sharply in his favor." *Ganden v. Nat'l Collegiate*

5

*Athletic Ass'n*, No. 96 C 6953, 1996 WL 680000, at *5 (N.D. Ill. Nov. 21, 1996); *see also Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 826 n.5 (7th Cir. 1998) (internal citations omitted). Applying the analysis used by the Seventh Circuit, Megan is entitled to a preliminary injunction.

### B. Megan is Likely to Prevail on the Merits of Her Claim that Defendant's Policies Violate Section 504 of the Rehabilitation Act and that Defendant is Responsible for Providing Interpreter Services.

Megan can demonstrate a substantial likelihood of success on the merits of the claim brought under Section 504, which provides:

> No otherwise qualified individual with a disability in the United States, . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a).

Megan easily satisfies the threshold requirements for a successful claim under Section 504. She has a disability and is "otherwise qualified" to participate in Defendant's programs and activities. (Compl. ¶ 49). Defendant is a covered entity under the Rehabilitation Act because it receives federal financial assistance. 29 U.S.C. § 794(a); (Compl. ¶¶ 11–12). Defendant's financial assistance policy and pilot policy are per se violations of Section 504. The policies, collectively, violate Section 504 because they place the burden of contracting and paying for auxiliary aids and services on Megan's family, and they condition financial assistance for these services on financial need. 29 U.S.C. § 794(a); (Compl. ¶¶ 51–52). As a result, there is a substantial likelihood of success on the merits of the Section 504 claim.

6

### 1. Megan Satisfies the Necessary Threshold Requirements for a Successful Claim Under Section 504.

To prevail on a claim brought under Section 504 of the Rehabilitation Act, a plaintiff must satisfy three threshold requirements. *Washington*, 181 F.3d at 843; *Jones v. Illinois Dept. of Rehab. Services*, 689 F.2d 724, 727 (7th Cir. 1982). First, the plaintiff must have a disability. *See Jones*, 689 F.2d at 727. Second, the plaintiff must be otherwise qualified to participate in the activity in dispute. *See id.* at 727 (remarking that Jones, who was deaf, was qualified "within the meaning of regulations promulgated pursuant to the [Rehabilitation] Act [because he met] the academic and technical standards requisite to admission and participation" in a vocational education program). Third, the defendant must conduct a program or activity that receives federal financial assistance. *Id.*

#### a.  Megan is an individual with a disability.

Megan is an "individual with a disability," as the term is defined in the Rehabilitation Act. An "individual with a disability" refers to a person who has "a physical or mental impairment that substantially limits one or more major life activities of such individual." 29 U.S.C. § 705(2)(B); 42 U.S.C. § 12102(1)(A).[1] The Seventh Circuit has recognized that deafness qualifies as a disability under the Rehabilitation Act. *See Knapp v. Nw. Univ.*, 101 F.3d 473, 479 (7th Cir. 1996) (remarking in a Rehabilitation Act case that blindness and deafness are "continuing" disabilities); *Jones*, 689 F.2d at 727 (noting that because Jones was deaf, he was "a handicapped[2] individual within the meaning of the [Rehabilitation] Act"). Megan is deaf, which

---

[1] Case law interpreting both the Rehabilitation Act and the Americans with Disabilities Act ("ADA") applies to the instant case. The Seventh Circuit has held that "the standards applicable to one act are applicable to the other. Title II of the ADA was modeled after § 504 of the Rehabilitation Act; the elements of claims under the two provisions are nearly identical, and precedent under one statute typically applies to the other." *Washington*, 181 F.3d at 845 n.6.

[2] The Rehabilitation Act has since been amended to replace the term "handicapped" with the term "disabled" to reflect societal changes in preferred terminology

7

substantially limits three major life activities—hearing, listening, and speaking. (Compl. ¶¶ 15–17). To fully participate in and to receive information in group settings, "Megan requires the assistance of a sign language interpreter." (Compl. ¶ 16). In the academic setting, Megan's school district has provided her with an Individualized Education Program that includes the services of a sign language interpreter for portions of the school day and for participation in after school clubs. (Compl. ¶¶ 18, 20). Megan is therefore an "individual with a disability" under Section 504.

### b. Megan is qualified to participate in and benefit from Girl Scout programs and activities..

Despite her deafness, Megan is otherwise qualified to participate in Girl Scouts. According to the Supreme Court of the United States, "[a]n otherwise qualified person is one who is able to meet all of a program's requirements in spite of [her] handicap." *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 406 (1979). More specifically, a qualified individual with a disability means "a handicapped person who meets the essential eligibility requirements for the receipt of such services." 28 C.F.R. § 41.32(b); *see also* 42 U.S.C. § 12131(2) (defining qualified individual with a disability under Title II of the Americans with Disabilities Act ("ADA")).

Legally-required auxiliary aids and services must be considered when determining whether an individual is "otherwise qualified." The United States Department of Justice regulations regarding federally-assisted programs state that:

> a recipient . . . shall provide appropriate auxiliary aids to qualified handicapped persons with impaired sensory, manual, or speaking skills where a refusal to make such provision would discriminatorily impair or exclude the participation of such persons in a program or activity receiving Federal financial assistance. Such auxiliary aids may include brailled and taped material, qualified interpreters, readers, and telephonic devices.

8

28 C.F.R. § 42.503(f); *see also* 28 C.F.R. § 42.503(b); 28 C.F.R. § 35.104 (Department of Justice regulations defining auxiliary aids and services under Title II of the ADA).

Megan is qualified because she meets the essential eligibility requirements for receipt of services by Defendant. Because she is qualified, she is entitled to auxiliary aids and services. With an interpreter, Megan is able to fully participate in Girl Scout programs and activities. *See Jones v. Illinois Dept. of Rehab. Services*, 504 F.Supp. 1244, 1246-47 (N.D. Ill. 1981), *aff'd by*, 689 F.2d 724 (7th Cir. 1982) (determining that a deaf student was entitled to sign language services in post-secondary education and vocational programs); *see also Camenisch v. Univ. of Texas*, 616 F.2d 127, 136 (5th Cir. 1980), *vacated as moot by Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981) (upholding preliminary injunction ordering that deaf student be provided sign language interpreter services); *Crawford v. Univ. of N. Carolina,* 440 F. Supp. 1047, 1059 (M.D.N.C. 1977) (preliminary injunction ordered requiring college to provide sign language interpreter service to ensure effective communication with deaf student); *Barnes v. Converse Coll.*, 436 F. Supp. 635, 639 (D.S.C. 1977) (same).

Indeed, from the fall of 2005 until the spring of 2011, Defendant willingly provided sign language interpreter services for troop meetings and outings, which enabled Megan to fully participate in and benefit from the Girl Scouts. (Compl. ¶ 29). Defendant provided interpreter services for almost six years, which demonstrates that Megan needed those services for effective communication. Furthermore, Defendant's provision of these services signifies that Defendant understood its legal obligations under Section 504 to provide interpreter services.

    **c.    Girl Scouts is a recipient of federal financial assistance pursuant to Section 504.**

Finally, Defendant is a covered entity under Section 504 because it receives federal financial assistance. *"Any program or activity"* that receives federal financial assistance is

9

prohibited from subjecting an otherwise qualified individual with a disability to discrimination solely because of that disability. 29 U.S.C. § 794(a) (emphasis added). A "program or activity" refers to "an entire . . . *private organization*, or an entire sole proprietorship—if assistance is extended to such . . . private organization, . . . *any part of which is extended* Federal financial assistance." 29 U.S.C. § 794(3)(A)(i) (emphasis added). By accepting federal funds, a private organization accepts "the obligation not to exclude from participation, deny benefits to, or subject to discrimination an otherwise qualified handicapped individual solely by reason of her handicap. Only by declining the federal financial assistance can [the organization] avoid this obligation." *Grzan v. Charter Hosp. of Nw. Indiana*, 104 F.3d 116, 120 (7th Cir. 1997).

Defendant's 2011 Annual Report states that for the 2011 fiscal year, Defendant received a donation from "Girl Scouts of the USA/Department of Justice" and a government grant in the amount of $164,476. GIRL SCOUTS OF GREATER CHICAGO AND NORTHWEST INDIANA, 2011 ANNUAL REPORT 18–19, *available a*thttp://issuu.com/girlscoutsgcnwi/docs/fy11_girl_scout_annual_report? Defendant falls within the jurisdiction of the Rehabilitation Act because it is a private organization that accepted funding from the United States Department of Justice. *See* 29 U.S.C. § 794(3)(A)(i).

### 2. Defendant's Policies are Per Se Violations of Section 504.

Defendant's financial assistance policy and pilot policy violate Section 504 because they require Megan, a qualified individual with a disability, to hire and pay for her own interpreter services. Section 504 requires the provision of auxiliary aids and services so that individuals with disabilities are not excluded from participation in a program receiving federal financial assistance. 28 C.F.R. § 42.503(f); s*ee also* 28 C.F.R. § 36.303(a) (Department of Justice Title II regulations). Defendant's financial assistance policy violates Section 504 in two ways. First, the

policy places the responsibility of seeking out and contracting necessary auxiliary aids and services on the applicant. (Pl.'s Ex. A, GSGCNWI Fin. Assistance Policy). The policy states that "the *contracting* of these assistants (e.g., interpreters, occupational therapists, nurse's aides) *is the responsibility of the girl's parent*(s) or guardian(s) or the adult requiring assistance." (*Id.* (emphasis added)). The Seventh Circuit has held that a recipient of federal financial assistance cannot shift the burden of contracting for auxiliary aids and services to the applicant. *See Jones,* 689 F.2d at 729 (finding that defendant violated Section 504 when it required a deaf student to provide his own interpreter). Second, the Defendant's policy conditions financial assistance for these costs on financial need by requiring submission of "a post-program/activity financial reconciliation form." (Pl.'s Ex. A, GSGCNWI Fin. Assistance Policy). In *United States v. Board of Trustees for the Univ. of Alabama*, the Eleventh Circuit struck down a similar policy and "affirm[ed] the district court's order enjoining UAB from denying auxiliary aids to handicapped students based on consideration of their financial status." 908 F.2d 740, 752 (11th Cir. 1990).

Defendant's pilot policy also violates Section 504 because it requires the applicant to pay for auxiliary aids and services. The pilot policy states that "through September 30, 2012 only, support services for those with special needs (e.g., interpreters, occupational therapists, nurse's aides) up to an individual maximum of $50/month per requester. The requestor is responsible for paying the balance of services in excess of $50. Regardless of the number and nature of the requests, there is a council-wide maximum of $5000." (Pl.'s Ex. A, GSGCNWI Fin. Assistance Policy). Although the policy permits Defendant to pay a portion of the cost of auxiliary aids and services, the policy is invalid because it still requires an applicant to contribute to these costs.

11

Moreover, the policy sets a council-wide maximum of $5000, without regard to the number of girls who need accommodations or the costs of the accommodations.

## C. Megan Has No Adequate Remedy at Law and Will Suffer Irreparable Injury if the Court Denies the Preliminary Injunction.

Megan will be irreparably harmed if Defendant's financial assistance and pilot policies are not declared invalid, and the Girl Scouts are permitted to refuse to provide her with interpreter services. A plaintiff has no adequate remedy at law when an award of damages at the end of trial will be "seriously deficient as a remedy for the harm suffered." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). The requirement of irreparable harm is met when the moving party will suffer harm during the pendency of the case "that cannot be prevented or fully rectified by the final judgment after trial." *Id.*

As the *Crawford* court noted, lack of participation in an educational program can constitute irreparable injury. 440 F. Supp. at 1058–59. Here, Defendant's refusal to provide an interpreter taken together with its two policies will irreparably harm Megan's social wellbeing and development because they prevent Megan from communicating and socializing with her peers and from participating in Defendant's programs and activities. In *Huezo v. Los Angeles Cmty. Coll.*, the court determined that a student who used a wheelchair would "suffer irreparable injury due to the numerous access barriers he encounter[ed] as a result of [defendant's] policies and procedures." 672 F.Supp.2d 1045, 1063 (C.D. Cal. 2008). Accordingly, the court granted a permanent injunction requiring the College to change its discriminatory policies. *Id.* at 1067 (ordering the College "to remove interim barriers by . . . making . . . paths of travel to classes and parking areas on campus a priority"). Similarly, Defendant's policies impose a language and communication access barrier that "den[ies Megan] the benefits of [Defendant's] services, programs, and activities." *Id.* at 1047; *see also Washington*, 181 F. 3d at 840 (affirming a

preliminary injunction and holding that a student's lost opportunity to compete in the remaining basketball season constituted irreparable harm).

This injury cannot be adequately compensated by money damages because Megan will forever lose the ability to fully and equally participate in the Girl Scouts. Since the date on which Girl Scouts stopped providing an interpreter and adopted its "pilot policy," Megan's membership in Girl Scouts has been and will continue to be harmfully interrupted because of her disability, not by her choice. She has missed and will continue to miss finite opportunities for social growth, leadership development, outings, friendships, and the opportunity to earn certain badges and awards during the pendency of her case. Simply put, childhood is a short and critical time; lost opportunities cannot be compensated through money alone.

### D. The Irreparable Harm Plaintiff Faces Without Preliminary Injunctive Relief Significantly Outweighs Any Harm to Defendant.

The balance of hardship weighs significantly in favor of Megan. If injunctive relief is denied and Defendant's discriminatory policies and practices remain in place, Megan will continue to be excluded from participating in the Girl Scouts, an activity that has afforded her much enjoyment and has been an important part of her life since kindergarten (Compl. ¶ 2, 22-28). Defendant, however, will suffer no hardship if preliminary injunctive relief is granted. Finding the policies invalid, and requiring the Girl Scouts to provide interpreter services as it has done in the past would pose no undue burden on Defendant, as Defendant's net assets exceed $26 million. GIRL SCOUTS OF GREATER CHICAGO AND NORTHWEST INDIANA, 2011 ANNUAL REPORT 18, *supra*.

In fact, this preliminary injunction would support Defendant's stated mission: to "build girls of courage, confidence, and character, who make the world a better place." GIRL SCOUTS, FACTS, http://www.girlscouts.org/who_we_are/facts/ (last visited Aug. 31, 2012). Furthermore,

13

the organization claims to have "a long history of adapting activities to girls who have disabilities, special needs, and chronic illnesses." GIRL SCOUTS, DIVERSITY, http://www.girlscouts.org/who_we_are/diversity/ (last visited Aug. 30, 2012). Accordingly, the harm to Megan from denying this preliminary injunction far outweighs any potential harm to Defendant that would result from granting this injunction.

### E. Granting the Preliminary Injunction Serves the Public Interest of Enforcing Anti-Discrimination Laws and Encouraging Integration of Individuals with Disabilities.

Granting interim relief declaring Defendant's financial assistance policy and pilot policy *per se* violations of Section 504, requiring Girl Scouts to provide an interpreter, and enjoining Defendant from further discrimination against Megan and other deaf or hard of hearing individuals would serve the public interest by furthering Section 504's purpose of ensuring integration of persons with disabilities. *See Nondiscrimination Based on Handicap in Federally Assisted Programs – Implementation of Section 504 of the Rehabilitation Act of 1973 and Executive Order 11914*, 45 Fed. Reg. 37622, 37629 (Dep't of Justice, June 3, 1980) ("Whatever method is chosen to meet physical accessibility and usability requirements, it is essential that Federally assisted programs be offered . . . in the most integrated setting appropriate to obtain the full benefits of the program"). Moreover, issuance of a preliminary injunction would serve a public interest beyond the general interest in enforcement of anti-discrimination laws. Megan's requested relief would allow her, and likely others, to become visible and active members of the Girl Scout community, a community that is globally respected for its dedication to helping "girls develop their full individual potential . . . develop values to guide their actions and provide the foundation for sound decision-making; and contribute to the improvement of society through their abilities, leadership skills, and cooperation with others." GIRL SCOUTS, FACTS, http://www.girlscouts.org/who_we_are/facts/ (last visited Sept. 6, 2012).

Holding the Defendant to its declared "commitment to diversity and inclusiveness" is also in the public interest, and in the spirit of the Girl Scouts. GIRL SCOUTS, HISTORY, http://www.girlscouts.org/who_we_are/history/ (last visited Aug. 30, 2012). This commitment allows non-disabled girls to interact with persons with disabilities and thus "relate to others with increasing understanding, skill, and respect." GIRL SCOUTS, FACTS, *supra*. The organization rightfully notes, "we need to continue to raise the bar and increase our efforts to ensure that girls of every background . . . have access to the numerous benefits of Girl Scouting." GIRL SCOUTS, DIVERSITY, http://www.girlscouts.org/who_we_are/diversity/ (last visited Aug. 30, 2012).

## IV. CONCLUSION

For the foregoing reasons, Megan Runnion respectfully requests this Court enter a Preliminary Injunction as fully set out in the relief requested in Plaintiff's Motion for Preliminary Injunction.

Respectfully Submitted,

MEGAN RUNNION, a Minor, through
Her mother and next friend,
EDIE RUNNION

By:/s/Steven P. Blonder
One of Her Attorneys

Steven P. Blonder (ARDC No. 6215773)
Joanne A. Sarasin (ARDC No. 0624335)
MUCH SHELIST, PC
191 North Wacker Drive, Suite 1800
Chicago, IL 60606
Telephone: (312) 521-2000
Facsimile: (312) 521-2100
sblonder@muchshelist.com
jsarasin@muchshelist.com

15

Laura J. Miller (ARDC #6202721)
Barry C. Taylor (ARDC #61999045)
Equip for Equality
20 North Michigan Avenue, Suite 300
Chicago, IL 60602
Telephone: (312) 341-0022
Telephone: (312) 341-0295
laura@equipforequality.org
barryt@equipforequality.org

Marc Charmatz (*pro hac vice*)
Debra Patkin (*pro hac vice*)
National Association of the Deaf
Law and Advocacy Center
8630 Fenton Street, Suite 820
Silver Spring, Maryland 20910
(301) 587-7732 (phone)
(301) 587-1791 (fax)
marc.charmatz@nad.org
debra.patkin@nad.org

*Attorneys for Plaintiff*