## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

MEGAN RUNNION, a minor,     )
through her mother and next friend,   )
EDIE RUNNION,     )
    )
    Plaintiff,     )
    )
    v.     )     Case No.: 1:12-cv-06066
    )
GIRL SCOUTS OF GREATER CHICAGO )
  AND NORTHWEST INDIANA,     )     Jury Demanded
    )
    Defendant.     )

### SECOND AMENDED COMPLAINT

Megan Runnion through her mother and next friend, Edie Runnion, and by her attorneys, sues the Defendant, Girl Scouts of Greater Chicago and Northwest Indiana ("GSGCNWI" or "Defendant"), and states as follows:

### PRELIMINARY STATEMENT

1.    Megan Runnion ("Megan") is a thirteen-year-old girl who joined Girl Scouts when she was in kindergarten. Megan is deaf, and communicates using American Sign Language ("ASL"). For six years, Defendant provided Megan with a sign language interpreter for troop meetings and outings, giving her an opportunity equal to that of her peers to participate in and benefit from Girl Scout activities. Megan loved being a Girl Scout.

2.    Near the start of the 2011-2012 school year, as Megan began sixth grade, Defendant stopped providing sign language interpreters. Despite requests by Megan's mother to reinstate the interpreter services, Defendant refused. Then, in January of 2012, without warning to Megan or her family, the troop leader announced that Megan's troop was disbanding. Megan's mother was informed that the troop was being disbanded because of her insistence that Defendant

provide interpreter services for Girl Scout programs and activities. Megan has not been offered placement in a new troop with interpreter services, despite her mother paying dues and requesting such placement. Thus, for the very first time since kindergarten, Megan is not a Girl Scout. Megan is heartbroken at the loss of this important part of her life.

3.     By refusing to provide sign language interpreter services and by disbanding the troop in retaliation for Megan's mother requesting auxiliary aids and services, Defendant violates Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794. Megan brings this lawsuit to compel Defendant to cease its discriminatory practices and to implement policies and procedures that will ensure effective communication and equal access for Megan so that she can participate in and benefit from Defendant's programs and activities. She also seeks compensatory damages, attorneys' fees, and costs.

## PARTIES

4.     Plaintiff, Megan Runnion ("Megan"), a minor, resides in Cook County, Illinois, with her parents, Vince and Edie Runnion, and her siblings.

5.     Next friend, Edie Runnion, is Megan's mother and resides in Cook County, Illinois, with her husband and four children.

6.     Defendant maintains its principal place of business at 20 S. Clark Street, Suite 200, Chicago, Illinois 60603.

7.     Defendant is a not-for-profit corporation organized under the laws of Illinois whose stated mission is to "build girls of courage, confidence, and character, who make the world a better place." GIRL SCOUTS, OVERVIEW, http://www.girlscoutsgcnwi.org/overview (Exhibit A).

8.     Defendant is "the largest Girl Scout council in the country, impacting the lives of nearly 87,000 girl members and 24,000 adult volunteers who reside in 245 communities in six

2

Illinois counties (Cook, DuPage, Grundy, Kankakee, Lake, and Will) and four Indiana counties (Jasper, Lake, Newton, and Porter)." GIRL SCOUTS, ABOUT US: WHO WE ARE, http://www.girlscoutsgcnwi.org/about-us (Exhibit B).

9.      For the 2010 tax year, Defendant's net assets were $28,443,485. GIRL SCOUTS OF GREATER CHICAGO AND NORTHWEST INDIANA, FORM 990: RETURN OF ORGANIZATION EXEMPT FROM INCOME TAX (2010) [hereinafter GSGCNWI FORM 990]. (Exhibit C)

10.      Defendant is a recipient of federal financial assistance within the meaning of 29 U.S.C. § 794(b).

## JURISDICTION

11.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, which gives district courts original jurisdiction over civil actions arising under the laws of the United States, and 28 U.S.C. §§ 1343(a)(3) and (4), which give district courts jurisdiction over actions to secure civil rights extended by the United States government.

12.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is a resident of this district, having its principal place of business at 20 S. Clark Street, Suite 200, Chicago, Illinois 60603.

## FACTUAL ALLEGATIONS

### Megan Runnion's Disability and Participation in Girl Scouts

13.      Plaintiff Megan Runnion ("Megan") is a thirteen-year-old girl who is deaf. Megan cannot hear spoken language.

14.      Megan requires the assistance of a sign language interpreter to receive information in group settings. The interpreter conveys through sign language the words spoken by the other members of the group.

3

5827224_1

15.     Megan is able to speak, but her speech is not always understood by hearing people.  In instances in which Megan cannot make her speech understood, the sign language interpreter performs the additional function of voicing what Megan is communicating through sign language.

16.     The "Language/Mode of Communication Used by Student" specified in Megan's Individualized Education Program, developed by her school district, includes American Sign Language ("ASL").  Megan receives 900 minutes per week of sign language interpreter services and 100 minutes per week of speech therapy services.  One of Megan's teachers knows sign language, so Megan does not need the services of an interpreter when she is being educated by that teacher.

17.     The school district's provision of sign language interpreter services allows Megan to be included in many classes with nondisabled students.

18.     The school district also provides an interpreter so that Megan can participate in and benefit from all after school activities in which she is involved.

19.     With interpreter services, Megan has been successful in school; she was one of only ten students in her school to receive the 2012 President's Education Award for Outstanding Academic Achievement from President Obama.

20.     Megan joined Girl Scouts as a "Daisy," which is the scouting level for girls in kindergarten through Grade 1.

21.     Megan's three siblings have all been involved with scouting.

22.     In the fall of 2005, when she began kindergarten, Megan became a member of Girl Scout Troop #40795.

23.     Troop #40795 was a member troop of Defendant until January 2012.

24.     Troop #40795 held monthly meetings, and members also attended outings such as rock climbing and camping trips.

25.     Megan loved being a Girl Scout and rarely missed a troop meeting or outing. She participated in and benefitted from many educational Girl Scout activities, which included learning how to administer first aid, how to cook outdoors, and how to use maps, compasses, and other navigational tools. She also learned about water safety rules and the traditions of people who live in other countries.

26.     Megan looked forward to seeing her friends at Girl Scouts, and especially looked forward to the troop camping trips.

27.     Defendant provided sign language interpreter services for troop meetings and outings from the date Megan joined Girl Scouts until August 2011.

28.     By providing a sign language interpreter, Defendant enabled Megan to understand what was said at Girl Scout meetings and activities, gave her equal access to the crucial educational, social, and leadership development offered to her peers, and allowed full and effective communication among Megan, her peers, and her troop leaders.

29.     On August 29, 2011, as she had done in previous years, Megan's mother submitted a request for sign language interpreter services prior to the start of the scouting year.

30.     On the same day, Defendant denied the request by e-mail, stating: "Currently the Council does not pay for these services."

31.     On October 27, 2011, Megan's mother submitted a reasonable accommodation request for interpreter services for a rock climbing event that was to take place on November 20, 2011.

5827224_1

32.     On November 10, 2011, Equip for Equality and the National Association of the Deaf, whose assistance Megan's parents had sought after the August denial of interpreter services, sent a letter to Defendant, requesting a qualified sign language interpreter for all of Megan's Girl Scout meetings and outings, including the scheduled November 20, 2011 rock climbing event.

33.     On November 17, 2011, Defendant responded to the November 10, 2011 letter by denying that Defendant was subject to Section 504. As to future meetings and events, Defendant stated that it was in the process of developing a uniform policy for providing interpreters.

34.     Defendant provided an interpreter for the November 20, 2011 rock climbing event and the December 13, 2011 troop meeting.

35.     At the same time, Defendant stated that it was still in the process of formulating a response to Edie Runnion's request for an interpreter for all troop meetings and events.

36.     On January 8, 2012, the leaders of Troop #40795 announced at a dinner event that Troop #40795 would be disbanded.

37.     This announcement was a complete surprise to Megan and her mother, neither of whom knew that the troop was going to be disbanded.

38.     Edie Runnion was advised by the troop leaders that the reason for the disbandment was her insistence that Defendant provide interpreter services for Girl Scout programs and activities.

39.     The troop leaders accused Edie Runnion of being selfish by thinking only about Megan and not about the other girls in the troop, and told her that it was her fault the troop was disbanding.

40.     The troop leaders also told Edie Runnion that they were informed by Defendant's CEO that providing an interpreter for Megan would cause registration fees for next year to triple.

41.     Additionally, the troop leaders told Edie Runnion that, because she was asking for an interpreter for Megan to be able to understand what was being said at the meetings, she was making her daughter more dependent and disabled.

42.     Megan very much wants to join and participate in another troop, but since Defendant has not agreed to provide interpreter services for any troop in its jurisdiction, Megan is unable to do so.  If Defendant provided interpreter services, Megan would happily join a new troop.

43.     Defendant has a "Financial Assistance Policy," which states:  "In order to support the participation of girls and adults with special needs, the Council will provide resource lists for girls and adults requiring skilled assistants to participate in Council programs and activities. The contracting of these assistants (e.g., interpreters, occupational therapists, nurse's aides) is the responsibility of the girl's parent(s) or guardian(s) or the adult requiring assistance."

44.     Defendant also adopted a "pilot policy," applicable during the events alleged in this Complaint, stating that it would provide "support services for those with special needs (e.g., interpreters, occupational therapists, nurse's aides) up to an individual maximum of $50/month per requester. The requestor is responsible for paying the balance of services in excess of $50. Regardless of the number and nature of the requests, there is a council-wide maximum of $5,000."

45.     The dollar amount of $50 will not pay for the use of an interpreter on even one occasion.

### Policies of the Girl Scouts of the United States of America that Apply to Defendant

46.     The Policies of the Girl Scouts of the United States of America ("GSUSA") state:  "All Girl Scout councils and USA Girl Scouts Overseas committees shall be responsible for

seeing that membership is reflective of the pluralistic nature of their populations and that membership is extended to all girls in all population segments and geographic areas in their jurisdictions.  A girl who meets or can meet membership requirements shall not be denied admission or access to Girl Scout program because of race, color, ethnicity, creed, national origin, socioeconomic status, or disability.  Reasonable accommodations shall be made for girls with disabilities to ensure that girls have access to activities."  GIRL SCOUTS BLUE BOOK OF BASIC DOCUMENTS POLICIES 22, *available at*

http://www.girlscoutsgcnwi.org/media/files/2012_blue_book.pdf.  (Exhibit D.)

47.     The Constitution of the GSUSA requires that "[l]ocal Girl Scout councils shall be organized to further the development of the Girl Scout Movement in the United States; to establish local responsibility for leadership, administration, and supervision of the program; and to develop, manage, and maintain Girl Scouting in accordance with the terms of their charters."  GIRL SCOUTS BLUE BOOK OF BASIC DOCUMENTS 10, CONSTITUTION OF GIRL SCOUTS OF THE UNITED STATES OF AMERICA, art. VII, *supra.*

48.     The Constitution of the GSUSA also states: "Grounded in the Girl Scout Promise and Law, Girl Scouting is a non-formal, experiential, and cooperative education program that promotes girls' personal growth and leadership development.  Partnering with caring adults, girls design fun and challenging activities that empower them and raise their voices within a local, national, and global sisterhood."  GIRL SCOUTS BLUE BOOK OF BASIC DOCUMENTS 7, CONSTITUTION OF GIRL SCOUTS OF THE UNITED STATES OF AMERICA, art. III, *supra.*

49.     The GSUSA classified itself as an "Educational Institution[]" in selecting "Service Categories" for purposes of "inclusion in the [Combined Federal Campaign] charity

list." 2011 CHICAGO AREA COMBINED FEDERAL CAMPAIGN 7, 88, *available at* http://www.chicago.feb.gov/SupportDocs/cfc_chicago_il_brochure_2011.pdf. (Exhibit E.)

50. Defendant states on its website that it is "the largest Girl Scout council in the country." GIRL SCOUTS, ABOUT US: WHO WE ARE, *supra*.

51. The Constitution and Policies of the GSUSA apply to both the GSUSA and Defendant.

52. Because the GSUSA is an "experiential and cooperative education program," Defendant is also an "experiential, and cooperative education program."

**Defendant Is a Program or Activity as Defined by 29 U.S.C. § 794(b)(3)(A)**

53. Defendant is a "private organization [to which federal financial] assistance is extended . . . as a whole." 29 U.S.C. § 794(b)(3)(A)(i).

54. Defendant receives federal financial assistance as a whole because it receives federal financial assistance from the U.S. Department of Education, Department of Housing and Urban Development, Department of Justice, and other federal agencies.

55. Defendant is a "private organization . . . which is principally engaged in the business of providing education, health care, . . . social services, or parks and recreation." 29 U.S.C. § 794(b)(3)(A)(ii).

56. Defendant states in its Form 990: Return of Organization Exempt from Income Tax that Defendant's "Girl Scout leadership experience is where girls discover – where girls discover a strong sense of self, connect – where girls develop healthy relationships, and take action – in identifying community needs." GSGCNWI FORM 990, *supra*.

57. Defendant's leadership experience programs provide Megan and other Girl Scouts with education, health care, social services, and/or parks and recreation opportunities.

5827224_1

58.     In the audited financial statement submitted by Defendant in its Illinois Charitable Organization Annual Report for the fiscal period beginning October 1, 2010 and ending September 30, 2011, "Girl Scouting" is described as "an out-of-school educational program designed to help girls put into practice the fundamental principles of the Girl Scout movement." GIRL SCOUTS OF GREATER CHICAGO AND NORTHWEST INDIANA, ILLINOIS CHARITABLE ORGANIZATION ANNUAL REPORT 41 (2011).  (Exhibit F.)

59.     Defendant receives federal financial assistance through a $28,000 grant from the U.S. Department of Housing and Urban Development for a program entitled GirlSpace.

60.     Defendant states on its website that GirlSpace "provides a safe space and structured, age-appropriate activities for low-income girls during the critical after-school hours, offered at 40 Chicago Public Schools."  GIRL SCOUTS, SPONSORS AND PARTNERSHIPS, http://www.girlscoutsgcnwi.org/sponsorships (last visited Nov. 1, 2012).  (Exhibit G.)

61.     In its 2011 Annual Report, Defendant stated: "By holding educational programs throughout the year . . . GirlSpace provided a safe space for 3,000 girls in low-income neighborhoods."  GIRL SCOUTS OF GREATER CHICAGO AND NORTHWEST INDIANA, 2011 ANNUAL REPORT 11.  (Exhibit H.)

62.     The GirlSpace program is an educational program of the Defendant.

63.     Defendant states in its Form 990 that its product sales program, which includes the Girl Scout Cookie Program, "is an integral part of our business and economic literacy initiative, which helps girls learn life skills such as money management, ethical decision-making, and goal setting."  GSGCNWI FORM 990, *supra*.

64.     Teaching life skills such as "money management, ethical decision-making, and goal setting" is an educational program of the Defendant.

65.     Defendant has a Financial Literacy and Entrepreneurship program, which enables all members to "develop and begin implementing financial skills and knowledge to help them set financial goals and gain the confidence necessary to take control of their financial future."  GIRL SCOUTS, SPONSORS AND PARTNERSHIPS, *supra*.

66.     Teaching financial literacy and entrepreneurial skills is an educational program of the Defendant.

67.     Defendant receives federal financial assistance from the U.S. Department of Education for a program entitled "STEM (science, technology, engineering, and math)."  GIRL SCOUTS, SPONSORS AND PARTNERSHIPS, *supra*.

68.     Defendant states on its website that "STEM . . . engages girls in innovative hands-on activities and discussions that encourage them to pursue STEM interests in both schools and careers, and improve their academic performance."  GIRL SCOUTS, SPONSORS AND PARTNERSHIPS, *supra*.

69.     The STEM program is an educational program of the Defendant.

70.     Defendant has a program entitled Un Lugar Para Las Ninas, which is "[b]ased on the GirlSpace model, . . . targets Hispanic girls and is offered in three Cicero, Illinois schools in a district classified as underperforming, with a demonstrated need for after-school programming." GIRL SCOUTS, SPONSORS AND PARTNERSHIPS, *supra*.

71.     The Un Lugar Para Las Ninas program is an educational program of the Defendant.

72.     Defendant's Journey World facility is "[a] state-of-the-art facility that offers 3rd-12th graders unique, immersive learning experiences that encourage them to explore careers in

11

science, technology, engineering, math, environmental sciences, commerce, entrepreneurism and finance." GIRL SCOUTS, SPONSORS AND PARTNERSHIPS, *supra*.

73. Defendant states on its website that "Journey World immerses children in learning" through "[s]ystemic career education and workforce development" and "partnerships with educators" in numerous programs including: Career Adventures Saturday, Dance Around the World, Dive In, Breathe Out, Extra! Extra!, It's Your Future – Dream It! Workshop, and Money Management. GIRL SCOUTS, JOURNEY WORLD, LOCATION AND WORKSHOPS, http://www.girlscoutsgcnwi.org/location-workshops (Exhibit I).

74. Defendant celebrates Journey World's "documented results and improvements," noting that "no other program more directly connects the business community and business leaders to the crucial educational issues of the 21st century and shows them how they can act to address those issues and improve the educational outcomes." GIRL SCOUTS, JOURNEY WORLD, LOCATION AND WORKSHOPS, *supra*.

75. Defendant states on its website that Journey World's sponsors include organizations such as The Art Institute of Chicago and Hostelling International Chicago, which "have an educational and functional role." GIRL SCOUTS, JOURNEY WORLD, SPONSORS, http:www.girlscoutsgcnwi.org/sponsors (Exhibit J).

76. Defendant also states on its website that "[p]rofessional and career development was a primary function of each of the [Journey World] partners, designing relevant and age-appropriate curriculum in conjunction with the Girl Scouts' own Journey resources." GIRL SCOUTS, JOURNEY WORLD, SPONSORS, *supra*.

77. The Journey World program is an educational program of the Defendant.

78.     Defendant's "Project Law Track is a series of interactive sessions all relating to the interesting field of law.  Female attorneys with the Chicago Bar Association's Alliance for Women committee and several teen girl scouts have designed [several] dynamic sessions."  GIRL SCOUTS OF GREATER CHICAGO AND NORTHWEST INDIANA, PROJECT LAW TRACK 2013, *available at* http://www.girlscoutsgcnwi.org/media/forms/PLT_General_Information_FY_2013.pdf. (Exhibit K.)

79.     During the Project Law Track program, "well-prepared Girl Scouts entered a courtroom at the United States Northern District of Illinois Court in Chicago ready to give their opening remarks, question the witnesses, analyze the facts, and reach a verdict within a reasonable doubt during a mock trial that brought the pilot to its finale.  Attorneys from the Alliance for Women volunteered to assist as mentors and resources during the trial, and as the judge presiding over the proceedings, although empowered girls clearly were in charge!"  GIRLS SCOUTS, JUST FOR TEENS, http://www.girlscoutsgcnwi.org/just_teens (Exhibit L).

80.     The Project Law Track program is an educational program of the Defendant.

81.     The Policies of the GSUSA state that "Girl Scouts of the United States of America, local councils, other units holding a credential, and USA Girl Scouts Overseas committees shall be responsible for seeing that all activities are planned and carried out so as to safeguard the *health*, safety, and general well-being of the participants."  GIRL SCOUTS BLUE BOOK OF BASIC DOCUMENTS 23, POLICIES, *supra* (emphasis added).  (Exhibit Z.)

82.     The GSUSA has partnered with First Lady Michelle Obama's Let's Move initiative and "offers a diverse range of innovative sports, fitness and nutrition programming from high-adventure outdoor activities, to planting community gardens, to healthy cooking and

5827224_1

nutrition programs." GIRL SCOUTS, LET'S MOVE NATIONAL CAMPAIGN, http://www.girlscoutsgcnwi.org/lets-move (Exhibit M).

83.     This partnership "empower[s] girls to become the leaders of their generation who are carrying forth the First Lady's message of healthy living to their peers, families and communities." GIRL SCOUTS, LET'S MOVE NATIONAL CAMPAIGN, *supra.*

84.     Defendant participates in the Let's Move National Campaign.

85.     Defendant states on its website that "Girl Scouts focuses on healthy living with programs reflecting that physical health, emotional health and self-esteem are all connected." GIRL SCOUTS, OVERVIEW, *supra.*

86.     The United Way of Metropolitan Chicago classifies Defendant as a "Funded Agencies: Health" organization. UNITED WAY OF METROPOLITAN CHICAGO, FUNDED AGENCIES: HEALTH, http://www.uw-mc.org/partners/agency-programs/funded-agencies-health/ (Exhibit N).

87.     On the Chicago Area Combined Federal Campaign website, Defendant is categorized as a "Health – General and Rehabilitative" organization. CHICAGO AREA CFC, CHARITY LOOKUP TOOL, https://www.cfcnexus.org/_chicagoareacfc/ (Exhibit O).

88.     On the same website, Defendant is also categorized as a "Mental Health, Crisis Intervention" organization. CHICAGO AREA CFC, CHARITY LOOKUP TOOL, *supra.*

89.     Defendant receives federal financial assistance through a $5,000 grant from the U.S. Department of Housing and Urban Development for a program entitled Healthy Living Initiative.

90.     Defendant states on its website that the "Healthy Living Initiative helps girls lead healthier lives by building their skills and knowledge relating to fitness, nutrition, self-esteem and relationships." GIRL SCOUTS, SPONSORS AND PARTNERSHIPS, *supra.*

5827224_1

91.     Defendant provides educational and/or health programs.

92.     Defendant classified itself as a "Public, Social Benefit: Multipurpose" organization in selecting "Service Categories" for purposes of "inclusion in the [Combined Federal Campaign] charity list."  2011 CHICAGO AREA COMBINED FEDERAL CAMPAIGN 7, 13, *supra*.

93.     Defendant also classified itself as a "Youth Development" organization.  2011 CHICAGO AREA COMBINED FEDERAL CAMPAIGN 7, 13, *supra*.

94.     Defendant receives federal financial assistance from the U.S. Department of Justice for a program entitled Stand Up! Step Out!  GIRL SCOUTS, SPONSORS AND PARTNERSHIPS, *supra*.

95.     Defendant states on its website that the Stand Up! Step Out! program "brings the Girl Scout Leadership Experience to girls incarcerated in the River Valley Detention Center in Joliet, Illinois.  It is aimed at giving girls the tools and knowledge they need to succeed in the world, and to avoid re-incarceration."  GIRL SCOUTS, SPONSORS AND PARTNERSHIPS, *supra*.

96.     Defendant's Stand Up! Step Out! Program is an educational program and/or social services program.

97.     Defendant promotes numerous social service projects including the Humanitarian Service Project, which, on Nov. 30, 2011 "suppl[ied] gifts for 1,200 needy children and 120 seniors [and] provide[d] food to the 250 families enrolled in their Children's Birthday Project and monthly delivery of 90 pounds of groceries to seniors served by their organization."  GIRL SCOUTS OF GREATER CHICAGO AND NORTHWEST INDIANA, BLAZING NEW TRAILS FOR GIRLS: 2012-13 PROGRAM ESSENTIALS 14, *available at* http://www.girlscoutsgcnwi.org/activities-events.  (Exhibit P.)

98. Defendant's Humanitarian Service Project is an educational program and/or social services program.

99. Defendant's other social service projects include: Share Your Soles, which "[c]ollect[s] gently worn shoes for children and adults in some of the most impoverished places in the world" and Sweet Connections, which "[c]reate[s] Valentine messages for residents of assisted living facilities."  BLAZING NEW TRAILS FOR GIRLS: 2012-13 PROGRAM ESSENTIALS 15, *supra*.

100. Defendant's additional service projects are educational program and/or social services program.

101. One of the requirements for the Girl's Scout highest award, the Gold Award, is completion of "80 hours or more, dedicated towards a service project that has lasting effects in the community." GIRL SCOUTS, ABOUT THE GOLD AWARD, http://www.girlscoutsgcnwi.org/gs_gold_award (last visited Nov. 2, 2012).  (Exhibit Q.)

102. The Gold Award program is an educational and/or social services program.

103. During the 2010 tax year, Defendant spent $1,626,548 on "camps and program centers in Wisconsin, Illinois and Indiana for camping and outdoor activities."  GSGCNWI FORM 990, *supra*.

104. Defendant has invested in various properties intended for parks and recreation activities, including Butternut Springs, Friendship Center, Greene Wood, Juniper Knoll, Palos, Pokonoka, and River Trails.  GIRL SCOUTS, SPECIAL ANNOUNCEMENT ABOUT WILD ROSE (POSTED SEPT. 14, 2012), *available at*  http://www.girlscoutsgcnwi.org/lrppc_purpose.  (Exhibit R.)

5827224_1

105.    Butternut Springs spans 304 acres and contains "eight winterized lodges, three platform tent units, and one unit of cabins," among other recreational amenities.  GIRL SCOUTS OF GREATER CHICAGO AND NORTHWEST INDIANA, COUNCIL PROPERTY STUDY: BUTTERNUT SPRINGS 4, *available at* http://girlscoutsofgreaterchicagoandnorthwestindiana.businesscatalyst.com/media/files/camp/butternut_springs.pdf.  (Exhibit S.)

106.    Defendant sponsors day camps, resident camps, and troop camps that seek to expose girls "to camping and outdoor education programs," including "overnights and adventures."  GIRL SCOUTS, DAY CAMP, RESIDENT CAMP AND TROOP CAMPING, www.girlscoutsgcnwi.org/camp (Exhibit T.).

107.    Defendant has a Girl Scout Pathway program that "focus[es] on the out-of-doors and environmental education."  GIRL SCOUTS, OVERVIEW, *supra*.  (Exhibit Y.)

108.    Specifically, one of the Defendant's programs, entitled Camp Pathways, provides a council-sponsored environmental education program entitled "It's Your Planet, Love It."  GIRL SCOUTS, CONTACT LIST BY SUBJECT AREA, http://www.girlscoutsgcnwi.org/contact-list-by-subject-area (Exhibit U.).

109.    Defendant states on its website that "[e]nvironmental leadership is a high priority in Girl Scouting.  In 2009, more than 83,000 girls nationwide worked directly with conservationists and scientists to complete environmental service projects in 43 states."  GIRL SCOUTS, OVERVIEW, *supra*.

110.    Defendant encourages its members to participate in numerous additional environmental education and outdoor activities, including: Air Aware, Animal Advocates,

5827224_1

Happy Habitats, High Adventure Weekend, and Nature Art. BLAZING NEW TRAILS FOR GIRLS: 2012-13 PROGRAM ESSENTIALS 25, 26, *supra*. (Exhibit V.)

111.    Defendant's environmental programs are educational and/or parks and recreation programs.

**Federal Financial Assistance**

112.    The GSUSA states in its Form 990: Return of Organization Exempt from Income Tax that it receives $2,669,632 in government grants. GIRL SCOUTS OF THE UNITED STATES OF AMERICA, FORM 990: RETURN OF ORGANIZATION EXEMPT FROM INCOME TAX 11 (2010) [hereinafter GSUSA FORM 990]. (Exhibit W.)

113.    The GSUSA states in its Form 990 that its largest "program service" by expense is "service delivery to local councils: provide direct consulting and technical assistance to all Girl Scout councils to ensure that Girl Scout programs and services are delivered effectively and consistently nationwide." GSUSA FORM 990, at 4, *supra*.

114.    The GSUSA states in its Form 990 that it provided $322,399 in grants and other assistance to Defendant for "Program Fulfillment." GSUSA FORM 990, at 43, 48, *supra*.

115.    In addition to being a direct recipient of federal funds, as alleged in ¶ ¶ 59, 66, 88, and 93, Defendant is also an indirect recipient and/or beneficiary of federal financial assistance through GSUSA.

116.    Federal agencies require applicants for federal financial assistance to sign an assurance of compliance, by which the organization "assures and certifies compliance with all applicable Federal statutes, regulations, policies, guidelines, and requirements," including "any applicable statutorily-imposed nondiscrimination requirements" such as the Rehabilitation Act of 1973. See U.S. DEPARTMENT OF JUSTICE, STANDARD ASSURANCES, *available at*

5827224_1

www.ojp.usdoj.gov/funding/forms/std_assurances.pdf; *see also* 28 C.F.R. § 41.5(a)(2).   (Exhibit X.)

## COUNT I - VIOLATION OF THE REHABILITATION ACT THROUGH DISCRIMINATION AGAINST MEGAN RUNNION

117.    Plaintiff re-alleges and incorporates herein the allegations set forth in Paragraphs 1-116 above.

118.    Section 504 provides, in pertinent part: "[N]o qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving federal financial assistance. . . ." 29 U.S.C. § 794.

119.    Megan is a qualified individual with a disability pursuant to Section 504 because she is substantially limited in the major life activities of hearing and speaking.  29 U.S.C. § 705(20)(B).

120.    By refusing to provide interpreter services – and thereby failing to provide the means for Megan to have effective communication with her peers, troop leader, and others – Defendant has excluded Megan from participation in and denied her the benefits of its program and services, solely by reason of her disability.

121.    Defendant's policy of treating the contracting of interpreters as the responsibility of a girl's parent or guardian or the adult requiring assistance violates Section 504.

122.    Defendant's "pilot policy," which limited funding for interpreter services to a maximum of $50/month per requester and which provided that the requestor is responsible for the balance of the services in excess of $50, violates Section 504 by conditioning auxiliary aids and services on financial need, failing to provide sufficient funds to hire an interpreter, and

5827224_1

delegating to the person with a disability (or her parents) the responsibility for hiring the interpreter.

## COUNT II - VIOLATION OF THE REHABILITATION ACT THROUGH RETALIATION AGAINST MEGAN RUNNION

123.    Plaintiff re-alleges and incorporates herein the allegations set forth in Paragraphs 1-116 above.

124.    Section 504 provides, in pertinent part: "[N]o qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving federal financial assistance. . . ." 29 U.S.C. § 794.

125.    Megan is a qualified individual with a disability pursuant to Section 504 because she is substantially limited in the major life activities of hearing and speaking.  29 U.S.C. §705(20)(B).

126.    Megan and her mother engaged in protected activity by requesting reasonable modifications and auxiliary aids and services for Megan's hearing disability.

127.    By disbanding Megan's troop in retaliation for Megan and her mother requesting reasonable modifications and auxiliary aids and services, Defendant retaliated against Megan for asserting her rights under Section 504 of the Rehabilitation Act.

## PRAYER FOR RELIEF

WHEREFORE, Megan, through her mother and next friend, Edie Runnion, respectfully request this Court to:

(1)    Issue a declaratory judgment that Defendant's actions, policies, practices, and procedures complained of herein violated Plaintiff's rights as secured by Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and

20

(2)     Enjoin Defendant from further discrimination against Megan and other deaf and hard of hearing individuals;

(3)     Order Defendant to promulgate new written policies and procedures to ensure that Defendant will provide auxiliary aids and services at all Girl Scout programs and activities to ensure effective communication with deaf and hard of hearing individuals; and

(4)     Order Defendant to promulgate new written policies and procedures to ensure that Defendants will notify individuals who are deaf and hard of hearing, including Megan, of their right to auxiliary aids and services at Defendant's programs and activities;

(5)     Award Plaintiff compensatory damages;

(6)     Grant Plaintiff attorneys' fees, costs and disbursements associated with this lawsuit;

(7)     Award Plaintiff any and all other relief that may be necessary and appropriate.

Respectfully Submitted,

MEGAN RUNNION, a Minor, through
Her mother and next friend,
EDIE RUNNION


By:     /s/Steven P. Blonder                
        One of her Attorneys

Steven P. Blonder (ARDC No. 6215773)
Jonathan L. Loew (ARDC No. 6184157)
Much Shelist, PC
191 North Wacker Drive, Suite 1800,
Chicago, Illinois 60606
Telephone:  (312) 521-2000
Facsimile:  (312) 521-2100
sblonder@muchshelist.com
jsarasin@muchshelist.com
jloew@muchshelist.com

5827224_1

Barry C. Taylor
Laura J. Miller
Rachel M. Arfa
Amanda Antholt
Equip for Equality
20 North Michigan Avenue, Suite 300
Chicago, IL 60602
Telephone:  (312) 341-0022
Telephone:  (312) 341-0295
barryt@equipforequality.org
laura@equipforequality.org
amanda@equipforequality.org
rachela@equipforequality.org


Marc Charmatz
National Association of the Deaf
Law and Advocacy Center
8630 Fenton Street, Suite 820
Silver Spring, Maryland 20910
(301) 587-7732 (phone)
(301) 587-1791 (fax)
marc.charmatz@nad.org

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I, Jonathan L. Loew, an attorney, certify that, on July 20, 2015, I caused a copy of **Plaintiff's Second Amended Complaint** to be served via the Court's electronic filing system on counsel:

Patrick S. Casey
Barbara R. Barreno
Sidley Austin LLP
One South Dearborn Street
Chicago, IL  60603

*/s/ Jonathan L. Loew*

5827224_1